UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TANYA COOPER & JOSEPH ROSE, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>-v-<br><br>ANHEUSER-BUSCH, LLC,<br><br>Defendant. | 20-CV-7451 (KMK)<br><br><u>OPINION & ORDER</u> |

<u>Appearances:</u>

Timothy J. Peter, Esq.
Innessa M. Huot, Esq.
Faruqi & Faruqi, LLP
Philadelphia, PA
*Counsel for Plaintiffs*

James F. Bennett, Esq.
Dowd Bennett LLP
Clayton, MO
*Counsel for Defendant*

Paul H. Schoeman, Esq.
Kramer Levin Naftalis & Frankel, LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs Tanya Cooper ("Cooper") and Joseph Rose ("Rose" and, together with Cooper, "Plaintiffs") bring this putative class action against Anheuser-Busch, LLC ("Defendant"), alleging that the labeling on certain products in Defendant's "Ritas" line of beverages is deceptive and misleading. Plaintiffs assert claims against Defendant for (1) violations of §§ 349 and 350 of the New York General Business Law, (2) breach of express warranty, (3) common law fraud, and (4) unjust enrichment. Before the Court is Defendant's Motion To Dismiss the First

Amended Complaint (the "Motion").  (*See* Not. of Mot. (Dkt. No. 22).)  For the following

reasons, the Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are drawn from Plaintiffs' First Amended Complaint and are taken as

true for purposes of resolving the instant Motion.

Defendant is an American brewing company that manufactures, markets, and distributes

malt beverages for sale nationwide.  (First Am. Compl. ("FAC") ¶¶ 14–15, 24, 33, 41 (Dkt. No.

16).)  This Action involves three such products—Defendant's (1) Lime-A-Rita Sparkling

Margaritas (the "Margarita Product(s)"), (2) its Sangria Spritz Sparkling Sangria Cocktail and

Rosé Spritz Sparkling Rosé Cocktail (the "Wine Product(s)"), and (3) its Mojito Fizz Sparkling

Cocktail (the "Mojito Product(s)" and, together with the Margarita Products and Wine Products,

the "Products").  (*Id.* ¶¶ 3–5, 18–42.)  The Products are marketed and labeled under the general

umbrella of Defendant's "Ritas" brand.  (*See id.* ¶¶ 1, 16, 18, 26, 35.)

The Margarita Products are sold in packaging which prominently displays the words

"LIME-A-RITA" and "SPARKLING MARGARITA."  (*See id.* ¶ 18.)[1]  The front packaging

contains an image of a margarita served with a salted rim and lime wedge.  (*See id.*)  Relying on

definitions of "margarita" from Merriam-Webster dictionary, Dictionary.com, and the

International Bartenders Association, Plaintiffs allege that "[i]t is common knowledge, and

indeed definitional, that a margarita contains tequila," and that, "[w]hen consumers order

margaritas at bars or other establishments selling alcoholic beverages, they reasonably expect to

---

[1] When referring to text printed on the Products' packaging, the Court will keep the
original capitalization.

receive a cocktail containing tequila." (*Id.* ¶¶ 19–21.)  Plaintiffs therefore contend that when reasonable consumers view the packaging of the Margarita Products, they would expect these products to contain tequila.  (*Id.* ¶ 22.)  But the Margarita Products do not contain tequila.  (*Id.* ¶ 23.)  In fact, the Margarita Products are malt beverages flavored to resemble a margarita—a fact disclosed in "a small font statement" on the bottom panel of the packaging.  (*Id.* ¶ 24.)  Plaintiffs aver that even if reasonable consumers were to catch this disclosure, it is "unlikely" they would understand that the Margarita Products lack tequila, "particularly in the context of the other prominent, false[,] and deceptive statements on the front packaging indicating that the products do contain tequila." (*Id.* ¶ 24.)  For these reasons, Plaintiffs allege that the packaging of the Margarita Products is false and misleading.  (*Id.* ¶ 25.)

The Wine Products are sold in packaging that contains images of three different canned beverages.  (*See id.* ¶ 26.)  Two of these cans contain the words "SANGRIA SPRITZ" and "SPARKLING SANGRIA COCKTAIL." (*Id.*)  The third can contains the words "ROSÉ SPRITZ" and "SPARKLING ROSÉ COCKTAIL." (*Id.*)  In the bottom left-hand corner of the packaging, there are small images of wine glasses next to a number indicating how many cans of each flavor come in the package.  (*See id.*)  Relying on definitions from Merriam-Webster, Plaintiffs allege that "[w]hen consumers order Rosé or a Sangria at bars or other establishments selling alcoholic beverages, they reasonable [sic] expect to receive wine or a wine-based beverage." (*Id.* ¶¶ 27–28.)  They also aver that the term "Spritz" is "well known as a wine-based cocktail." (*Id.* ¶ 29.)  Accordingly, they assert that reasonable consumers of the Wine Products would expect these products to contain wine.  (*Id.* ¶ 30.)  Like the Margarita Products, however, the Wine Products are flavored malt beverages that contain no wine.  (*Id.* ¶¶ 32–33.)  Although the packaging discloses this fact, it does so in small font on the bottom panel of the packaging.

(*Id.* ¶ 33.)  For the same reasons identified with respect to the Margarita Products, Plaintiffs allege that the packaging of the Wine Products is also false and misleading.  (*Id.* ¶ 34.)

Like the Wine Products, the Mojito Products are sold in packaging that contains images of three different cans.  Two cans contain the words "MOJITO FIZZ" and "SPARKLING COCKTAIL."  (*Id.* ¶ 35.)  The third can contains the words "COSMO FIZZ" and "SPARKLING COCKTAIL."  (*Id.*)  The packaging also displays the words "SPARKLING CLASSIC COCKTAILS."  (*Id.*)  At the bottom of the front packaging, there are small images of Collins cocktail glasses and a martini glass next to a number indicating how many cans of each flavor come in the package.  (*Id.*)  Once again, Plaintiffs rely on definitions from Merriam-Webster, Dictionary.com, and the International Bartenders Association for the proposition that reasonable consumers would expect the Mojito Products to contain rum.  (*Id.* ¶¶ 36–39.)  But the Mojito Products, like the Margarita Products and Wine Products, are malt beverages.  (*Id.* ¶ 41.)  Though flavored to resemble a mojito, they contain no rum.  (*Id.*)  Again, the disclosure indicating that the Mojito Products are malt beverages appears in small font on the bottom panel of the packaging.  (*Id.*)  Based on these features of the Mojito Products' packaging, Plaintiffs allege that the packaging is false and misleading.  (*Id.* ¶ 42.)

Plaintiffs allege that the Products' packaging is also misleading in light of similar labeling used by competitor products.  (*See id.* ¶¶ 43–51.)  For example, other companies sell canned beverages with labeling such as "SPARKLING MARGARITA" (Jose Cuervo), "CLASSIC Margarita" (Salvador's), or "Perfect Margarita" (BuzzBox).  (*See id.* ¶¶ 43–45.)  But these products, in contrast to the Margarita Products, actually do contain tequila.  (*Id.* ¶ 43.)  Plaintiffs allege that these competing products "demonstrate that the market and consumers have associated the cocktail name 'margarita' with a beverage containing tequila."  (*Id.* ¶ 45.)  They

give similar examples with respect to canned mojitos, canned sangria, and canned rosé.  (*See id.* ¶¶ 46–51.)

Plaintiff Cooper purchased a 12-pack of the Margarita Product and a 12-pack of the Mojito Product at a Stop & Shop in Mount Kisco, New York in December 2019.  (*Id.* ¶ 12.) Plaintiff Rose purchased a 12-pack of the Margarita Product and a 12-pack of the Wine Product from a Rite-Aid in Brooklyn, New York in July 2020.  (*Id.* ¶ 13.)  In each case, Plaintiffs purchased the Products under the expectation that they contained tequila (the Margarita Products), wine (the Wine Products), or rum (the Mojito Products).  (*Id.* ¶¶ 12–13.)  Neither Plaintiff saw a disclaimer indicating that the Products were flavored malt beverages that contained none of these ingredients.  (*Id.*)  Plaintiffs maintain that had they known these Products were merely flavored malt beverages, they would not have purchased the Products or would have paid significantly less for them.  (*Id.*)  They allege that they—along with other members of a putative class—"have been, and will continue to be, deceived or misled by Defendant's false and deceptive packaging of the Products."  (*Id.* ¶ 52.)

Although substantially similar claims have been raised in the District Court for the Western District of Missouri, *see Browning v. Anheuser-Busch, LLC*, —F. Supp. 3d—, 2021 WL 1940645 (W.D. Mo. May 13, 2021), Plaintiffs' allegations present a matter of first impression in this District.

### B.  Procedural History

Plaintiffs filed their initial Complaint on September 11, 2020.  (Dkt. No. 1.)  On December 21, 2020, Defendant filed a pre-motion letter regarding its anticipated motion to dismiss.  (Dkt. No. 13.)  Plaintiffs filed their First Amended Complaint (the "FAC") on January 6, 2021.  (Dkt. No. 16.)  On January 20, 2021, Defendant again filed a pre-motion letter outlining

the grounds for its proposed motion to dismiss.  (Dkt. No. 17.)  Following Plaintiffs' response to

this letter, (Dkt. No. 19), the Court held a pre-motion conference on February 11, 2021, (*see* Dkt.

(minute entry for Feb. 11, 2021)).  Pursuant to the briefing schedule adopted at this conference,

Defendant filed the instant Motion and supporting papers on February 25, 2021.  (*See* Not. of

Mot.; Decl. of Paul H. Schoeman, Esq., in Supp. of Def.'s Mot. ("Schoeman Decl.") (Dkt. No.

23); Def.'s Mem. of Law in Supp. of Mot. ("Def.'s Mem.") (Dkt. No. 24).)  Plaintiffs filed their

Opposition on March 11, 2021, (*see* Pls.' Opp'n to Def.'s Mot. ("Pls.' Opp'n") (Dkt. No. 25)),

and Defendant filed its Reply on March 25, 2021, (*see* Def.'s Reply in Supp. of Mot. ("Def.'s

Reply") (Dkt. No. 26)).  On May 14, 2021, Plaintiffs notified the Court of supplemental

persuasive authority from the United States District Court for the Western District of Missouri.

(Dkt. No. 27.)  Defendant filed a brief response on May 17, 2021.  (Dkt. No. 28.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of

his [or her] 'entitlement to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (alteration omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement."  *Id.* (alteration, citation, and internal quotation marks

omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief

above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B.  Analysis

As noted, Plaintiffs assert claims against Defendant for (1) violations of §§ 349 and 350 of the New York General Business Law, (2) breach of express warranty, (3) common law fraud, and (4) unjust enrichment.  (FAC ¶¶ 80–121.)  The Court will take each claim in order.

### 1.  New York General Business Law §§ 349 and 350

Plaintiffs' first and second causes of action are based on §§ 349 and 350, respectively, of the New York General Business Law ("GBL").  (*Id.* ¶¶ 80–97.)  "Section 349 prohibits '[d]eceptive acts or practices in the conduct of any business, trade or commerce,' whereas [§] 350 prohibits '[f]alse advertising in the conduct of any business, trade or commerce.'"  *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at *2 (S.D.N.Y. Jan. 19, 2021) (alterations in original) (quoting GBL §§ 349–50).  "'The standard for recovery under . . . § 350, while specific to false advertising, is otherwise identical to [§] 349,' and therefore the Court will merge its analysis of the two claims."  *Cosgrove v. Oregon Chai, Inc.*, No. 19-CV-10686, 2021 WL 706227, at *6 (S.D.N.Y. Feb. 21, 2021) (citation omitted); *see also Barreto v. Westbrae Nat., Inc.*, — F. Supp. 3d —, 2021 WL 76331, at *2 (S.D.N.Y. Jan. 7, 2021) (same); *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (noting that "courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same" (citation omitted) (alteration in original)).  To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Wynn*, 2021 WL 168541, at *2 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)); *see also Oregon Chai*, 2021 WL 706227, at *6 (same); *Twohig v. Shop-Rite Supermarkets, Inc.*, — F. Supp. 3d —, 2021 WL 518021, at *3 (S.D.N.Y. Feb. 11, 2021) (same).

### a.  Consumer-Oriented Conduct

Defendant does not contest the consumer-oriented nature of its conduct.  (*See generally* Def.'s Mem.)  "A defendant engages in 'consumer-oriented' activity if [the company's] actions cause any 'consumer injury or harm to the public interest.'"  *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  This requirement is liberally construed, *id.*, and "may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers,'" *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (alteration in original) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)).  Here, Plaintiffs allege that Defendant is responsible for "formulat[ing], manufacturing, brewing, packaging, marketing, distributing, and [selling] . . . the Products nationwide, including in New York."  (FAC ¶ 14.)  They also allege that they and other members of the putative class "have been, and will continue to be, deceived or misled by Defendant's false and deceptive packaging of the Products."  (*Id.* ¶ 52.)  These allegations are sufficient to satisfy the first element of Plaintiffs' GBL claims.  *See Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 665 (N.Y. 1999) (observing that GBL §§ 349–50 "apply to virtually all economic activity, and their application has been correspondingly broad" (footnote omitted) (gathering cases)); *Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App. Div. 2000) (noting that "consumer-oriented" requirement may be satisfied "by a showing that the practice has a broader impact on the consumer at large").

### b.  Materially Misleading Conduct

Defendant's briefing focuses primarily on the second element of Plaintiffs' GBL claims— whether the Products' labeling is materially misleading.  (*See* Def.'s Mem. 7–18.)  To survive a motion to dismiss, "Plaintiffs must do more than plausibly allege that a label might conceivably

be misunderstood by some few consumers." *Twohig*, 2021 WL 518021, at *3 (alteration

omitted) (quoting *Sarr v. BEF Foods, Inc.*, No. 18-CV-6409, 2020 WL 729883, at *3 (E.D.N.Y.

Feb. 13, 2020)).  Rather, they must "plausibly allege that a significant portion of the general

consuming public or of targeted customers, acting reasonably in the circumstances, could be

misled." *Id.* (quoting *Sarr*, 2020 WL 729883, at *3).  In evaluating the instant Motion, "the

Court considers whether the [FAC] plausibly alleges that a reasonable consumer would ascribe

the meaning that [P]laintiffs allege they ascribed to it."  *Fishon v. Peloton Interactive, Inc.*, No.

19-CV-11711, 2020 WL 6564755, at *7 (S.D.N.Y. Nov. 9, 2020).

Defendant urges the Court to conclude as a matter of law that the Products are not

materially misleading and dismiss the GBL claims.  (*See* Def.'s Mem. 7–18.)  At this stage of the

case, however, such a determination is appropriate only if Plaintiffs' claims are "patently

implausible" or "unrealistic."  *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914, 2017 WL

4277187, at *4 (S.D.N.Y. Sept. 25, 2017) (citing *Stoltz v. Fage Dairy Processing Indus., S.A.*,

No. 14-CV-3826, 2015 WL 5579872, at *20 (E.D.N.Y. Sept. 22, 2015)); *see also In re Frito-Lay

N. Am., Inc. All Nat. Litig.*, No. 12-MD-2413, 2013 WL 4647512, at *16 (E.D.N.Y. Aug. 29,

2013) (observing that dismissal as a matter of law is appropriate where a plaintiff's allegations

regarding deceptive labeling "border on fantasy").  For example, courts have dismissed deceptive

labeling claims at the pleadings stage where plaintiffs tried to draw highly specific inferences

regarding the source or predominance of a particular flavor or ingredient identified on a label,

*see, e.g.*, *Twohig*, 2021 WL 518021, at *4 (concluding that the word "vanilla" on the front label

would not "lead a reasonable consumer to believe that vanilla from vanilla beans is the exclusive

or predominant flavor ingredient"); *Kennedy v. Mondelēz Global LLC*, No. 19-CV-302, 2020 WL

4006197, at *11–12 (E.D.N.Y. July 10, 2020) (concluding that the terms "made with real honey,"

"Honey Maid," and "no high fructose corn syrup" did not misleadingly suggest that honey was the "exclusive or predominant sweetener" used in the defendant's graham crackers); where the relevant labeling clearly precluded the possibility of deception, *see, e.g.*, *Devane v. L'Oréal USA, Inc.*, No. 19-CV-4362, 2020 WL 5518484, at *1, 4–5 (S.D.N.Y. Sept. 14, 2020) (holding that a label that described a hair-care product as "100% Vegan" and "Keratin Caring" did not misleadingly suggest that the product itself contained keratin, in part because (1) the label clearly indicated that the product *cared* for keratin, and (2) such an inference was inconsistent with the representation that the product was "100% Vegan"); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 244 (S.D.N.Y. 2007) (holding that a reasonable consumer would not be misled into believing that a concert was guaranteed to take place as scheduled where the ticket stated, "DATE & TIME ARE SUBJECT TO CHANGE"); and where the plaintiffs' alleged inference appeared fundamentally incompatible with basic common sense, *see, e.g.*, *Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 495, 501 (2d Cir. 2020) (ruling that a reasonable consumer purchasing a grab-and-go "Angus Steak & Egg Breakfast Sandwich" (~$4) or an "Angus Steak & Egg Wake-Up Wrap" (~$2) from Dunkin Donuts would not be misled into thinking she was purchasing an actual, intact "steak"); *Kommer v. Bayer Consumer Health*, 252 F. Supp. 3d 304, 306, 311 (S.D.N.Y. 2017) (dismissing a claim that the "Dr. Scholl's Custom Fit Orthotics Foot Mapping Kiosk" (the "Kiosk") misleads consumers into believing they are having custom orthotics designed for their feet because, "[a]t the point that the consumer is directed [by the Kiosk] to select a pre-packaged [i]nsert stacked along shelves on the side of the Kiosk, . . . it is no longer reasonable for [a consumer] to think that he is getting a product 'individually designed' for his feet" (record citation omitted)), *aff'd*, 710 F. App'x 43 (2d Cir. 2018) (summary order).

But these cases are exceptions to the norm.  Although the inquiry into whether a product is materially misleading may be decided as a matter of law, *see Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013), "this inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage," *Duran*, 450 F. Supp. 3d at 346 (gathering cases); *see also Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489, 2016 WL 4367991, at *14 (S.D.N.Y. Aug. 12, 2016) (same); *Hidalgo v. Johnson & Johnson Consumer Cos.*, 148 F. Supp. 3d 285, 295 (S.D.N.Y. 2015) (noting that "usually [this] determination is a question of fact" (citation omitted)); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) (same).

Here, the Court cannot conclude, as a matter of law, that the Products' labeling "would *not* be misleading to a reasonable consumer."  *Rivera v. Navient Solutions, LLC*, No. 20-CV-1284, 2020 WL 4895698, at *8 (S.D.N.Y. Aug. 19, 2020).  Stated differently, Plaintiffs' claims do not "border on fantasy," *In re Frito-Lay*, 2013 WL 4647512, at *16, and are not "patently implausible," *Stoltz*, 2015 WL 5579872, at *20, so as to require dismissal at this stage of the case.  To the contrary, Plaintiffs have cogently explained how reasonable consumers might be misled into thinking that the Products were canned cocktails, instead of "Flavored Malt Beverage[s]."  (FAC ¶ 33 (alteration in original).)  Such a mistake is not hard to imagine. Defendant labels its Mojito Product as a "SPARKLING *CLASSIC COCKTAIL*," (*id.* ¶ 35 (emphasis added)), its Wine Product as a "SPARKLING SANGRIA *COCKTAIL*" or "SPARKLING ROSÉ *COCKTAIL*," (*id.* ¶ 26 (emphasis added)), and its Margarita Product as a "SPARKLING *MARGARITA*," (*id.* ¶ 18 (emphasis added)).  A "cocktail," according to Merriam-Webster, is a "usually iced drink of wine or distilled liquor mixed with flavoring ingredients." Merriam-Webster, *cocktail*, Merriam-Webster.com/dictionary/cocktail (last visited July 15,

2021).  As Plaintiffs note, a "margarita" is defined as "a cocktail consisting of tequila, lime or

lemon juice, and an orange-flavored liqueur."  (FAC ¶ 20 (citation and emphasis omitted).)

"Rosé" is defined as a type of wine, "sangria" is defined as a wine-based "punch," and a

"mojito" is defined as a cocktail containing rum.  (*Id.* ¶¶ 28, 37 (citing Merriam-Webster for

each).)  Thus, it is more than plausible that a reasonable consumer viewing a package labeled

"SPARKLING MARGARITA" would assume the beverage inside contained tequila.  Likewise,

a reasonable consumer might plausibly assume that products labeled "SPARKLING ROSÉ

COCKTAIL," "SPARKLING SANGRIA COCKTAIL," or "MOJITO FIZZ"/"SPARKLING

CLASSIC COCKTAIL[]" contained rosé, sangria, or rum, respectively.  The imagery used on the

Products' packaging does little to dispel such misconceptions.  If anything, the image of a

margarita and the symbols of wine glasses and Collins cocktail glasses, (*see id.* ¶¶ 18, 26, 35),

could arguably reinforce a consumer's impression that the beverages inside were actually

cocktails, *cf. Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 241–42 (S.D.N.Y.

2020) (defendant's allegedly misleading claim that its "hens have better lives than other hens

because they have access to the outdoors" was "only reinforced by . . . images of hens frolicking

in elysian pastures").

       In response to Plaintiffs' allegations, Defendant suggests an alternative interpretation of

the Products' labeling.  "[R]easonable consumers," it argues, "understand that the references to

margaritas, mojitos[,] and the like are 'merely a flavor designator, not an ingredient claim.'"

(Def.'s Mem. 10 (quoting *Twohig*, 2021 WL 518021, at *3).)  Of course, Defendant will have an

opportunity to test that hypothesis in discovery.  But at the motion-to-dismiss stage, "[w]here a

representation is capable of two possible reasonable interpretations," the Court is not free to

reject "the misleading one . . . simply because there is an alternative, non-misleading

interpretation." *Fishon*, 2020 WL 6564755, at *7.  Here, as in most cases, the question of whether Defendant's labeling would prove misleading to the reasonable consumer is a question of fact that cannot be resolved on a motion to dismiss.  *See id.* at *7–8 (denying motion to dismiss where the defendant described its digital library of fitness classes as "ever-growing," despite the fact that the library was shrinking in size); *Duran*, 450 F. Supp. 3d at 349 (same with respect to allegedly misleading statement that the defendant's hair styling product caused "no flakes"); *Wedra v. Cree, Inc.*, No. 19-CV-3162, 2020 WL 1322887, at *1, 8 (S.D.N.Y. Mar. 20, 2020) (same with respect to allegedly misleading statements that the defendant's lightbulbs "would last 22+ or 45+ years," that customers would "save upwards of hundreds of dollars per bulb over the lifetime of the bulbs," and that "the bulb[s] would perform better than less expensive LED and non-LED bulbs" (record citation omitted)); *Lugones*, 440 F. Supp. 3d at 233, 241–42 (same with respect to allegedly misleading statement that "[m]ost hens don't have it as good as [the defendant's hens] . . . [who] can peck, perch, and play on plenty of green grass" (record citation omitted) (first alteration in original)); *Eidelman*, 2017 WL 4277187, at *1, 3–4 (same with respect to allegedly misleading statement that the defendant's laundry detergent was "from the #1 Detergent Brand Recommended by Dermatologists for Sensitive Skin"); *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 559, 566 (S.D.N.Y. 2016) (same with respect to allegedly misleading statements marketing the defendant's body care products as "natural," "all natural," and "naturally derived"); *Singleton v. Fifth Generation, Inc.*, No. 15-CV-474, 2016 WL 406295, at *10 (N.D.N.Y. Jan. 12, 2016) (same with respect to allegedly misleading statement that the defendant's vodka was "handmade"); *Stoltz*, 2015 WL 5579872, at *16–20 (same with respect to allegedly misleading statement that the defendant's Greek yogurt was "Total 0%" so as to suggest a lack of calories, carbohydrates, and other qualities); *Silva v. Smucker Nat. Foods, Inc.*,

No. 14-CV-6154, 2015 WL 5360022, at *10 (E.D.N.Y. Sept. 14, 2015) (same with respect to

allegedly misleading statement that the defendant's root beer was "natural"); *Paulino v.

Conopco, Inc.*, No. 14-CV-5145, 2015 WL 4895234, at *1, *5–6 (E.D.N.Y. Aug. 17, 2015) (same

with respect to the allegedly misleading descriptor "Suave NATURALS," used to market body

care products that contained unnatural and synthetic ingredients); *Goldemberg*, 8 F. Supp. 3d at

478–82 (same with respect to the allegedly misleading descriptor "Active Naturals," used to

market body care products that contained synthetic ingredients); *Koenig v. Boulder Brands, Inc.*,

995 F. Supp. 2d 274, 287–89 (S.D.N.Y. 2014) (same with respect to allegedly misleading

statement that the defendant's milk products were "Fat Free").

     Defendant raises several additional arguments as to why the Court should grant its

Motion and dismiss Plaintiffs' GBL claims prior to discovery. The Court will address each

argument as necessary to resolve the instant Motion.

### i. Absence of Representation Regarding Distilled Spirits or Wine

     First, Defendant argues that the Products are not misleading as a matter of law because

their packaging does not identify tequila, wine, or rum as ingredients in the beverages. (*See*

Def.'s Mem. 8–11.) The cases on which it relies, however, are distinguishable.

     Citing *Daniel v. Mondelez International, Inc.*, 287 F. Supp. 3d 177, 190 (E.D.N.Y. 2018),

Defendant argues that, "[w]ithout a material misrepresentation that the Ritas beverages contain

the types of alcohol Plaintiffs cite, they fail to state a claim," (Def.'s Mem. 9). *Daniel* involved

an allegation that the "non-functional slack-fill"—essentially the "excessive empty space"—in

the defendant's box of Swedish Fish candy "misrepresent[ed] the amount of food" in violation of

GBL §§ 349–50. 287 F. Supp. 3d at 181. The court dismissed the claim, relying on several cases

which held "that reasonable consumers would not be misled by non-functional slack-fill as a

matter of law where the products clearly disclosed accurate net weight and/or the total product count." *Id.* at 190 (citing, *inter alia*, *Fermin v. Pfizer Inc.*, 215 F. Supp. 3d 209, 212 (E.D.N.Y. 2016)). As these facts suggest, *Daniel* is too dissimilar to furnish persuasive guidance in this case. There was no allegation, for example, that the product in *Daniel* falsely purported to contain a particular ingredient, and the court dismissed the claim on the basis that the label in question provided "accurate, clearly visible" disclosures which negated the alleged deception. *See id.* at 182, 192–93.[2] Although the *Daniel* court correctly stated that an actionable claim under GBL §§ 349–50 requires a "material misrepresentation," *id.* at 189, the case is otherwise inapposite here.[3]

---

[2] Although the court in *Daniel* found that the product's label precluded any claim of deception, *see* 287 F. Supp. 3d at 192–93, it drew a distinction in this regard between alleged "misrepresentations concerning *quantitative* as opposed to *qualitative* characteristics of a product." *Id.* at 192 n.14. The court suggested that plaintiffs are more likely to bring a viable misrepresentation claim—notwithstanding a "disclaimer"—where the claim is based on a qualitative, as opposed to a quantitative, aspect of the product. *See id.* (explaining that "[w]hen the alleged misrepresentation concerns a qualitative quality, consumers are more often forced to weigh various competing statements to tease out the truth—allowing for differing reasonable interpretations"). That is because "when the alleged misrepresentation concerns only the amount or quantity of a product, consumers, once apprised of the express accounting on the label, cannot be said to be misled." *Id.*

Although Defendant does not rely on *Daniel* when discussing the Products' allegedly immunizing disclaimer, (*see* Def.'s Mem. 14–16), the distinction identified by the *Daniel* court would cut in Plaintiffs' favor. In the Court's view, Plaintiffs are making a claim about a qualitative aspect of the Products—that is, they argue that Defendant's labeling makes a representation about a particular *quality* of the Products, namely that they contain wine or distilled liquor. Though one could also frame the alleged misrepresentation in quantitative terms—where the claim is that the Products purport to contain an amount of distilled liquor or wine that is greater than zero—that is a more strained construction of the claim.

[3] Moreover, Defendant neglects to note that *Daniel*, a decision from the Eastern District of New York, is directly in conflict with a case from this District, *Izquierdo v. Mondelez International, Inc.*, No. 16-CV-4697, 2016 WL 6459832 (S.D.N.Y. Oct. 26, 2016), in which the court "decline[d] to adopt [the defendant's] theory that a manufacturer of a deceptively packaged product is immune from suit so long as the package accurately lists the product's net weight and quantity[,]" *id.* at *7. Though the *Daniel* court acknowledged *Izquierdo*, it instead relied on a previous Eastern District case that *Izquierdo* had declined to follow. *See* 287 F. Supp. 3d at 190,

Defendant's reliance on *Devane* is likewise unavailing.  Defendant cites *Devane* for the proposition that "it is not reasonable to assume that a product contains a certain ingredient when it is not listed."  (Def.'s Mem. 9 (quoting *Devane*, 2020 WL 5518484, at *4).)  But Defendant's citation omits critical context.  In *Devane*, the plaintiff alleged that the labeling on the defendant's "100% Vegan," "EverSleek Keratin Caring" line of hair care products deceptively suggested that the products themselves contained keratin, which is a protein naturally present in human hair.  *See* 2020 WL 5518484, at *1.  The court dismissed the claim on three independent grounds.  First, the court noted a fundamental "discrepancy" within the plaintiff's claim: The products could not simultaneously be vegan *and* contain keratin, a human chemical.  *See id.* at *4.  Second, the court observed that "none of the ingredients listed on either bottle include[d] keratin as an ingredient."  *Id.*  And third, the court concluded that the plaintiff's claim was foreclosed by the language on the products' labeling itself, which clearly indicated that the products "*care[d]* for the keratin already found in the hair."  *Id.* at *5.  Although Defendant relies on the *Devane* court's second basis for dismissing the plaintiff's claim, (*see* Def.'s Mem. 9), the court's analysis in this respect is subject to critique.  The only support cited by the *Devane* court for this prong of its decision was a Second Circuit summary order in *Jessani v. Monini North America, Inc.*, 744 F. App'x 18 (2d Cir. 2018) (summary order).  In *Jessani*, the plaintiffs alleged that the labeling used on a mass produced, relatively inexpensive olive oil—which described the product as "Truffle Flavored"—was misleading because the oil did not, in fact, contain real truffles.  *See* 744 F. App'x at 19–20.  In support of their claim, the plaintiffs elaborated on the

---

192 (relying on *Fermin*, 215 F. Supp. 3d at 212, and concluding that, "[t]o the extent *Izquierdo* stands for the proposition that accurate disclosure of net weight and quantity can *never* cure misrepresentations arising from non-functional slack-fill under New York consumer protection laws as a matter of law, the [c]ourt disagrees with such a ruling").  Because the Court finds *Daniel* largely inapplicable here, it need not navigate this intra-Circuit dispute.

rarity and cost of real truffles, noting, for example, that truffles were "the most expensive food in the world," could "cost hundreds or even thousands of dollars per ounce," and were "highly perishable," "seasonal," and "impossible to mass produce." *Id.* at 19 (record citations omitted). "*In this context*," the Second Circuit explained, "representations that otherwise might be ambiguous and misleading are not: it is simply not plausible that a significant portion of the general consuming public acting reasonably would conclude that [the defendant's] mass produced, modestly-priced olive oil was made with 'the most expensive food in the world.'" *Id.* (emphasis added) (record citation and footnote omitted). "This is particularly so," the court added, "given that the product's ingredient list contains no reference to the word 'truffle' and the primary label describes the product only as being 'Truffle Flavored.'" *Id.* at 19–20.

Several aspects of *Jessani* merit comment. First, there is the threshold fact that the case was resolved by summary order, which does not have precedential effect. *See* Second Circuit Local Rule 32.1.1(a). Second, the court made clear that its determination—like all such determinations under the GBL—was highly context-specific. *See* 744 F. App'x at 19; *see also Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) ("In determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." (citation and brackets omitted)). Specifically, the court's conclusion rested on the fact that, "[i]n th[e] context" of the ingredient in question—alleged to be the most expensive food in the world—it was implausible that a significant portion of consumers could be misled into thinking that a mass-produced, budget-friendly olive oil contained that ingredient. *See* 744 F. App'x at 19. Third, the product's ingredient list was one of several factors the court cited when evaluating the context of the allegedly misleading statement. *See id.* at 19–20. In finding the plaintiffs' claim implausible, the court relied primarily on the price discrepancy between truffles and the mass-

produced olive oil in question, as well as the inference consumers would draw from that discrepancy. *See id.* at 19. The court then added that this conclusion was "particularly" true in light of two secondary factors: the product's ingredient list (which did not contain truffle) *and* the product's label (which described the product only as truffle *flavored*). *See id.* at 19–20. In other words, the fact that "truffle" did not appear in the product's ingredient list did not carry dispositive weight in the court's analysis. *Jessani* did not announce a sweeping rule "that it is not reasonable to assume that a product contains a certain ingredient when it is not listed in the ingredient list." *Devane*, 2020 WL 5518484, at *4. Indeed, such a rule would be inconsistent with a binding Second Circuit opinion issued eight days after *Jessani*, in which the court said that "[r]easonable consumers should not be expected to look beyond misleading representations on the front of [a] box to discover the truth from the ingredient list in small print on the side of the box." *Mantikas*, 910 F.3d at 637 (alteration omitted) (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008)). Standing alone, the fact that a particular ingredient—tequila, say—does not appear on a product's ingredient list does not automatically defeat a deceptive labeling claim as a matter of law. To the extent *Devane* suggests otherwise, the Court believes that view is based on a misreading of *Jessani*—a case which, as noted, does not have precedential effect.

Defendant also seeks to rely on the recent vanilla cases from this District. (*See* Def.'s Mem. 9–10.) In these cases, the plaintiffs alleged that the word "vanilla" (or the phrase "vanilla bean") conveyed a specific representation about the source of a product's vanilla flavor. *See, e.g.*, *Dashnau v. Unilever Mfg. (US), Inc.*, —F. Supp. 3d—, 2021 WL 1163716, at *1, *3 (S.D.N.Y. Mar. 26, 2021) (gathering cases). Because the vanilla flavoring in each product was not derived exclusively or even predominantly from natural vanilla, the plaintiffs alleged that the

products' labels were misleading.  *See, e.g.*, *id.* at *1–2.  Courts rejected this theory, holding as a matter of law that the product labels were not misleading because, while "vanilla" (or "vanilla bean") describes a flavor, it does not make a representation regarding the source of that flavor. *See id.* at *5; *Oregon Chai*, 2021 WL 706227, at *12 (concluding that the word "vanilla" on the front of the package "appears to describe a flavor more than an ingredient"); *Twohig*, 2021 WL 518021, at *4 (concluding that the word "vanilla" on the front label would not "lead a reasonable consumer to believe that vanilla from vanilla beans is the exclusive or predominant flavor ingredient"); *Wynn*, 2021 WL 168541, at *4 (concluding that the "[d]efendant's 'Vanilla Almondmilk' front label makes no representations whatsoever about the source of the vanilla flavor or the ingredients constituting it"); *Barreto*, 2021 WL 76331, at *4 (concluding that the product's labeling—which contained the words "Vanilla Soymilk" and "Natural Vanilla Flavor With Other Natural Flavors"—"makes a representation regarding its flavor and does not imply or represent [that] the source of that flavor comes exclusively or predominantly from natural vanilla"); *Cosgrove v. Blue Diamond Growers*, No. 19-CV-8993, 2020 WL 7211218, at *3 (S.D.N.Y. Dec. 7, 2020) (concluding that a reasonable consumer would associate the word "vanilla" with a flavor, rather than a particular ingredient); *Pichardo v. Only What You Need, Inc.*, No. 20-CV-493, 2020 WL 6323775, at *5 (S.D.N.Y. Oct. 27, 2020) (noting that "reasonable consumers associate the word 'vanilla' with a flavor, not with an ingredient"); *Steele v. Wegmans Food Markets, Inc.*, 472 F. Supp. 3d 47, 50 (S.D.N.Y. 2020) (explaining that the word "vanilla" assists buyers in determining the *flavor* of a product, rather than the source of that flavor).

According to Defendant, Plaintiffs are making an analogous claim here, essentially arguing that the Products' labeling conveys a message about the source of the Products' alcoholic content, or the source of their margarita, wine, or mojito flavoring.  (*See* Def.'s Mem. 10

(arguing that the Margarita Products "make no representation . . . that tequila is the source of the alcohol"); *id.* (arguing that "references to margaritas, mojitos and the like are 'merely . . . flavor designator[s], not an ingredient claim'" (citation omitted)).)  But that is a warped reading of Plaintiffs' claims.  With respect to the Margarita Products, for example, Plaintiffs are not making a claim about the source of the beverage's alcoholic content or "margarita" flavor.  Fairly construed, their claim is that the beverage purports to be something—a "margarita"—which it is not.  Their claim rests on the premise that a "margarita" generally refers to a beverage (not a flavor), made with standard constituent parts (including tequila), that one would purchase for direct consumption (not as a flavoring agent).  (*See* FAC ¶¶ 19–21.)  In this sense, a "margarita" (or "mojito," etc.) is to be distinguished from vanilla, which generally serves as a flavoring agent in other products, as opposed to a discrete item one might order in a bar or restaurant.[4]  As noted, discovery will give Defendant an opportunity to test its assertion that words such as "margarita" and "mojito" are merely flavor indicators like "chocolate" and "vanilla," and do not make a representation that the beverages are *actually* a "margarita" or a "mojito."  But for purposes of resolving this Motion, where the Court "must draw reasonable inferences in favor of the non-moving [P]arty," *CFTC v. TFS-ICAP, LLC*, 432 F. Supp. 3d 320, 324 (S.D.N.Y. 2020), the Court is not prepared to accept Defendant's argument.  Though creative, this argument is a strained attempt to shoehorn this Action under the analytic framework of the vanilla cases.

In addition to the authority already addressed, Defendant purports to invoke "[n]umerous other decisions . . . in accord with the principle that deception claims require a firmer premise

---

[4] Although one might order a margarita or mojito at a bar, one would not order a "vanilla."  Even at an ice cream shop, if someone asks for "vanilla," it is understood they are referring to a vanilla-*flavored* product, such as a vanilla milkshake or vanilla ice cream cone.  And although consumers may of course purchase vanilla beans or vanilla extract as a standalone item, that was not the posture in any of the vanilla cases.  *See, e.g.*, *Dashnau*, 2021 WL 1163716.

than imputing statements to defendants that they clearly did not make." (Def.'s Mem. 10.)  None

of these cases alters the analysis here.  In *Kennedy*, for example, the plaintiffs made similar

allegations to those in the vanilla cases, arguing that certain statements on a box of graham

crackers—"made with real honey," "Honey Maid," and "no high fructose corn syrup"—

misleadingly suggested (1) that honey was the only sweetener used, (2) that only pure honey was

used, (3) that the honey content was greater than the white sugar content, and (4) that honey was

the exclusive or predominant sweetener." 2020 WL 4006197 at *2, 11.  The court held that these

statements "provide[d] no basis for a reasonable consumer to make any of the inferences that

[the] [p]laintiffs allege[d] [were] misleading." *Id.* at *12.  The claims here, however, are not

analogous to those in *Kennedy*.  Plaintiffs are not making a claim about the source or

predominance of a particular ingredient; their argument is that the Products lack certain

ingredients reasonably suggested by their labeling.  If the Margarita Products' packaging

declared that they were "Made with Real Tequila," and Plaintiffs argued that the packaging

conveyed a representation that the beverage contained *exclusively* natural tequila, with no

artificial imitators or substitutes, then *Kennedy* and the vanilla cases might constitute persuasive

authority.  But the claims here are sufficiently distinct as to render these cases inapposite.

Likewise, the remaining cases cited by Defendant, (*see* Def.'s Mem. 10–11), are too dissimilar to

carry any persuasive force here, *cf. Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701, 705

(2d Cir. 2020) (summary order) (affirming decision which held that no reasonable consumer

would be misled into thinking that the defendant's product—"Florida's Natural" orange juice—

did not contain any trace amounts of glyphosate based on the word "natural" in the product's

brand name); *Rivas v. Hershey Co.*, No. 19-CV-3379, 2020 WL 4287272, at *5 (E.D.N.Y. July

27, 2020) (concluding in dicta that a reasonable consumer would not be misled into thinking that

"Kit Kat White" candy bars were actually "dipped in white chocolate when the packaging does

not mention chocolate, and states that the wafers are dipped in crème, which is not the same as

white chocolate"); *Kommer*, 252 F. Supp. 3d at 306, 311 (S.D.N.Y. 2017) (see parenthetical

*supra*).[5]

### ii.  Contextual Factors

Defendant also argues that Plaintiffs' claims are "implausible" in light of various

contextual considerations, specifically (1) federal regulations, (2) the "full context" of the

Products' packaging, (3) the setting in which Plaintiffs purchased the Products, and (4) the labels

of the comparator products invoked by Plaintiffs.  (*See* Def.'s Mem. 11–14.)  The Court will

address each argument in turn.

First, Defendant argues that Plaintiffs' inferences regarding the Products are unreasonable

because, under federal regulations, it may use "a cocktail name as a brand name or fanciful

name."  (*Id.* at 11 (quoting 27 C.F.R. § 7.29(a)(7)(iii)).)  But the portion of the regulation cited by

Defendant omits important qualifying language.  27 C.F.R. § 7.29(a)(7) prohibits a malt beverage

label from containing "[a]ny statement, design, device, or representation that tends to create a

false or misleading impression that the malt beverage contains distilled spirits or is a distilled

spirits product."  *Id.* § 7.29(a)(7).  However, this provision does not prohibit "[t]he use of a

cocktail name as a brand name or fanciful name of a malt beverage, *provided that the overall

label does not present a misleading impression about the identity of the product*."  *Id.*

§ 7.29(a)(7)(iii) (emphasis added).  Thus, although federal regulations do allow Defendant to use

---

[5] In *Rivas*, the court dismissed the plaintiff's claim for lack of subject matter jurisdiction.
*See* 2020 WL 4287272, at *4.  However, it briefly addressed the merits of the claim to determine
whether to grant leave to amend.  *See id.* at *4–6.

a cocktail name as a "brand name" or "fanciful name" for a malt beverage, these regulations do not allow Defendant to "present a misleading impression about the identity of the product," *id.*, which is precisely the conduct alleged here.  It is also worth noting that, beyond the provisions of § 7.29(a)(7), § 7.29(a)(1) separately prohibits "[a]ny statement that is false or untrue in any particular, or that, irrespective of falsity, directly, or by ambiguity, omission, or inference, . . . *tends to create a misleading impression*." *Id.* § 7.29(a)(1) (emphasis added).  Contrary to Defendant's suggestion, then, Plaintiffs' theory is fully consistent with federal regulations.  The target of this Action is not Defendant's use of "a cocktail name as a brand name or fanciful name" *per se*, but the alleged use of this artifice in a deceptive fashion.  Such deception is no more permitted under federal regulations than it is under state law.  *Cf. Browning*, 2021 WL 1940645, at *3 (rejecting identical argument by Defendant because the plaintiffs, raising virtually identical claims to those here, "ha[d] adequately alleged [that] the overall label is misleading" under Missouri law).

Second, Defendant argues that "the full context of the [Products'] packaging refutes Plaintiffs' notion that a reasonable consumer could assume Ritas contain hard liquor or wine." (Def.'s Mem. 13.)  It is true, as noted, that "[i]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial." *Mantikas*, 910 F.3d at 636 (citation omitted).  Courts must "therefore consider [a] challenged advertisement as a whole." *Id.*; *see also Stoltz*, 2015 WL 5579872, at *16 (advising that "it is necessary to consider not only the allegedly misleading statement but also the surrounding context based on the content of the entire label or advertisement at issue").  As already discussed, however, whether a label is misleading is normally a question of fact that cannot be resolved on a motion to dismiss. *See, e.g.*, *Segedie v. Hain Celestial Grp., Inc.*, No. 14-CV-5029, 2015 WL 2168374, at *12 (S.D.N.Y.

May 7, 2015) (noting that "[w]hether [a] label[] would mislead a reasonable consumer is a question of fact for the jury").  Defendant's own arguments underscore this point.  Defendant notes, for example, that the "'cocktail' terms" on which Plaintiffs focus "do not stand alone," but are just "one part of the fanciful names used for Ritas products."  (Def.'s Mem. 12.)  Defendant's theory is that other features of the Products' packaging—specifically, the references to (1) "Ritas," (2) "'sparkling' drinks," and (3) a "wide variety of flavors in both words and images"— "make it obvious that the [P]roducts are a different type of beverage inspired by—but not the same as—the referenced cocktails."  (*Id.*)  For reasons already discussed, that conclusion is not "obvious," and the features Defendant cites do not make it so.

 With respect to the "Ritas" branding, Defendant obliquely suggests that because the brand name is owned by Defendant, "a company synonymous with beer," reasonable consumers would conclude that the Products do not contain wine or distilled liquor.  (*See id.*)  That argument is unpersuasive for several reasons.  First, the argument assumes that reasonable consumers associate Defendant exclusively with beer.  That proposition is not alleged in the FAC, and it requires a factual determination that cannot be made on a motion to dismiss.  Second, the names "Anheuser-Busch" or "A-B" do not appear in the images of the Products' labeling provided in the FAC, (*see* FAC ¶¶ 18, 26, 35), and the Court has no basis to assume that consumers would otherwise know the Products were manufactured and marketed by Defendant.  Third, insofar as Defendant contends that the word "Ritas" itself clearly connotes that the beverage is *not* a cocktail, it is not obvious why reasonable consumers would draw that conclusion.  Finally, with respect to the words "sparkling" and the "wide variety of flavors in both words and images" used on the Product labels, Defendant does not explain—and again, it is not clear to the Court—why reasonable consumers would conclude that the Products were

"obvious[ly]" not cocktails.  (*See* Def.'s Mem. 12.)  Even if the Court found these arguments more persuasive, the fact remains that Defendant is asking the Court to make a highly subjective evaluation about how reasonable consumers would interpret certain words and images.  This is a paradigmatic question of fact that cannot be resolved on the instant Motion.

Third, Defendant notes that in the state of New York, wine and liquor cannot be sold in convenience and drug stores like those in which Plaintiffs purchased the Products.  (*Id.* at 13.)  Defendant argues that reasonable consumers know this fact, and thus, they would not infer that beverages sold in a drug or convenience store contained tequila, wine, or rum.  (*Id.*)  Although "reasonable consumer[s] do[] not lack common sense," (*id.* (quoting *Daniel*, 287 F. Supp. 3d at 193)), at this stage of the case, the Court may not resolve questions regarding "the background knowledge, experience[,] and understanding of reasonable consumers" as a matter of law, *Stoltz*, 2015 WL 5579872, at *19 (rejecting a similar argument based on customers' alleged background knowledge regarding nutritional labeling).  There is good reason for this principle: "A federal trial judge, with a background and experience unlike that of most consumers, is hardly in a position to declare" that, because he or she knows that wine and hard spirits may not be purchased in a drug or convenience store, "all [customers] must appreciate [that fact] as well." *See Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 407 (E.D.N.Y. 2004); *see also Rivera*, 2020 WL 4895698, at *7 ("In determining whether an act is 'materially misleading,' the reasonable consumer is not held to the same standard as a lawyer trained to make fine distinctions reading a bond indenture or a regulation.").  In this case, the knowledge and expectations of reasonable consumers purchasing alcoholic beverages in a drug or convenience store "cannot be resolved without surveys, expert testimony, and other evidence of what is happening in the real world."  *Verizon Directories*, 309 F. Supp. 2d at 407.  Neither the

26

Second Circuit's opinion in *Chen*, nor its summary order in *Jessani*—both of which Defendant cites, (*see* Def.'s Mem. 13)—is to the contrary.  A consumer's mistaken assumption that she can purchase a beverage containing wine or distilled liquor in a drug or convenience store is not comparable to a consumer's putative belief that an "Angus" breakfast sandwich sold for under $5 at Dunkin Donuts is an actual, "intact" steak, *cf. Chen*, 954 F.3d at 495, 501, or that a "mass produced, modestly-priced olive oil [is] made with 'the most expensive food in the world,'" *cf. Jessani*, 744 F. App'x at 19 (footnote and record citation omitted).  In *Chen* and *Jessani*, the contextual discrepancy was based on price—specifically, the implausible price discrepancy between the product being purchased and the product that plaintiffs allegedly thought they were getting.  Here, the contextual discrepancy is based on state alcohol laws, something that may be far less obvious to the reasonable consumer.  Specifically, the discrepancy is between Plaintiffs' expectations—that they could purchase wine or distilled liquor at a Stop & Shop or Rite-Aid— and the reality that, under New York law, such purchases are outlawed.  To find that reasonable consumers would not countenance this discrepancy, the Court would have to impute to these consumers a threshold background knowledge regarding New York's alcohol laws.  But for reasons already discussed, the Court may not do so at this stage in the case.

Fourth, Defendant argues that Plaintiffs' claims are undermined by the comparator products they cite in the FAC, "whose labels expressly state that they contain spirits and wine." (Def.'s Mem. 13–14.)  According to Defendant, these products show that when a product contains wine or distilled liquor, reasonable consumers expect the product to state as much explicitly.  (*Id.*)  Defendant raises a fair distinction in this regard.  Unlike the Products, several of the comparator brands invoked by Plaintiffs do make a more explicit representation that they contain wine or spirits.  (*See* FAC ¶¶ 44, 47, 50.)  But that distinction does not defeat the instant

claims.  Ultimately, the inquiry is how reasonable consumers interpret Defendant's Products—a question of fact that cannot be resolved at this stage of the case.  Although the clear disclosures on the comparator products might cast some doubt on Plaintiffs' theory, they have still advanced claims that are sufficiently credible to survive this Motion and proceed to discovery.

Accordingly, the four contextual factors cited by Defendant do not warrant dismissal of Plaintiffs' GBL claims.

### iii.  Disclosures Regarding "Flavored Malt Beverages"

Defendant also argues that the disclosures on the bottom of the Products' packaging—which state that the Products are flavored malt beverages—render Plaintiffs' "purported assumption about the [Products'] alcohol ingredients . . . unreasonable."  (Def.'s Mem. 14.)  In considering whether a label is misleading, courts consider "the challenged advertisement as a whole, including disclaimers and qualifying language."  *Mantikas*, 910 F.3d at 636.  "[U]nder certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception."  *Fink*, 714 F.3d at 742.  "[T]he mere inclusion of an accurate disclaimer," however, "does not necessarily cure other potentially misleading statements or representations set forth in a label or advertisement."  *Stoltz*, 2015 WL 5579872, at *16 (gathering cases); *see also Mantikas*, 910 F.3d at 637 (concluding that certain disclosures on the side panel of a Cheez-Its box did not "render [p]laintiffs' allegations of deception implausible").  "Rather, the significance of a disclaimer depends upon factors such as the font size and placement of the disclaimer as well as the relative emphasis placed on the disclaimer and the allegedly misleading statement."  *Stoltz*, 2015 WL 5579872, at *16 (gathering cases).

The Second Circuit's opinion in *Mantikas* illustrates these principles.  There, the court scrutinized the labeling on two boxes of Cheez-Its crackers: the first box contained the words

"WHOLE GRAIN" in large print at the center of the front panel, with the words "MADE WITH

5G OF WHOLE GRAIN PER SERVING" in smaller print at the bottom of the same panel; the

second box contained the words "MADE WITH WHOLE GRAIN" in large print at the center of

the front panel, with the words "MADE WITH 8G OF WHOLE GRAIN PER SERVING" in

smaller print at the bottom of the same panel.  910 F.3d at 634–35.  The side of each box

contained a "Nutrition Facts" panel disclosing—"in much smaller print"—that a serving size was

29 grams and that "enriched white flour" was the first ingredient on the ingredient list.  *Id.*  The

court found that the small-print disclosures on the side of the box did not "cure[] the deceptive

quality of the 'WHOLE GRAIN' claims as alleged by [p]laintiffs."  *Id.* at 637.  Relying on a

Ninth Circuit decision, the court observed that "[r]easonable consumers should not be expected

to look beyond misleading representations on the front of the box to discover the truth from the

ingredient list in small print on the side of the box," but should instead "expect that the

ingredient list contains more detailed information about the product that *confirms* other

representations on the packaging."  *Id.* (alteration omitted) (quoting *Williams*, 552 F.3d at 939–

40).  The ingredient list and Nutrition Facts panel on the side of the Cheez-Its boxes

"contradict[ed], rather than confirm[ed]," the "[d]efendant's 'whole grain' representations on the

front of the box."  *Id.*  Because those disclosures did not render the "[p]laintiffs' allegations of

deception implausible," *id.*, the court vacated the district court's decision granting the

defendant's motion to dismiss, *id.* at 639.

Here, likewise, the Court cannot conclude that the disclosures on the bottom of

Defendant's packaging renders Plaintiffs' "allegations of deception implausible" as a matter of

law.  *Id.* at 637.  This approach is consistent not only with *Mantikas*, but also with numerous

District Court decisions declining to dismiss similar claims based on a label's less-than-

prominent disclosures.  *See, e.g., Stoltz*, 2015 WL 5579872, at *14–19 (declining to hold as a matter of law that no reasonable consumer would be misled by the product's prominent "Total 0%" representation, despite the presence of (i) clarifying language ("nonfat") indicating that "Total 0%" referred only to fat content, and (2) a nutritional panel that contained accurate information as to the product's calorie, fat, carbohydrate, and sugar content); *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2014 WL 4773991, at *9 (E.D.N.Y. Sept. 24, 2014) (declining to hold as a matter of law that a check solicitation scheme was not deceptive, despite the presence of certain fine-print disclosures, because "[t]he disclosures . . . [were] not conspicuous or prominent enough to necessarily cure [consumers'] misperception" that they were receiving a refund); *Goldemberg*, 8 F. Supp. 3d at 479–80 (holding, where a product "exclusively tout[ed]" its natural ingredients, that disclosure of synthetic ingredients in an ingredient list did not defeat plaintiffs' deceptive labeling claim as a matter of law); *Koenig*, 995 F. Supp. 2d at 287–88 (despite label disclosing that a product contained one gram of fat, court could not hold as a matter of law that the product's use of the phrase "Fat Free" was not misleading, because "a reasonable consumer might also focus on the more prominent portion of the product label that touts the product as 'Fat Free Milk and Omega-3s,' and overlook the smaller text that discloses the fat content on the front of the carton or the nutrition label"); *In re Frito-Lay*, 2013 WL 4647512, at *16 (although certain disclosures ("No MSG–No Preservatives–No Artificial Flavors") "g[a]ve context" to a label's pronouncement that a product was "Made with ALL NATURAL ingredients," the court could not hold as a matter of law that "no reasonable consumer would be deceived into believing the product [was] GMO-free" based on the "ALL NATURAL" representation); *Ackerman v. Coca-Cola Co.*, No. 09-CV-395, 2010 WL 2925955, at *16 (E.D.N.Y. July 21, 2010) (information in nutritional panel, "though

relevant, [did] not as a matter of law extinguish the possibility that reasonable consumers could be misled by [a product's] labeling and marketing").

Defendant argues that *Mantikas* was limited to "addressing a specific concern" where "packaging . . . makes 'an express claim about ingredients' and 'strongly suggests' that a particular ingredient is the 'predominant[] or exclusive[]' one in the product." (Def.'s Mem. 15 (alterations in original) (quoting *Wynn*, 2021 WL 168541, at *4).) This argument does not alter the Court's conclusion for two reasons.

First, the Court is not persuaded by Defendant's attempt to limit the application of *Mantikas* to cases in which the allegedly deceptive labeling makes an express claim about ingredients or suggests that a particular ingredient is predominant in the product. (*See id.*) Although the Cheez-Its boxes in *Mantikas* made explicit ingredient claims—that the crackers were "made with" whole grain—there is nothing in the decision to suggest that its analysis should be any less relevant here, where it is alleged that a product makes an *implicit* ingredient claim. Although Defendant cites several cases that distinguish *Mantikas*, (*see* Def.'s Mem. 15), it misconceives the nature of the distinction those courts were drawing. In the cases cited by Defendant, each court found that the alleged misrepresentation did not make an ingredient claim in the first place (distinguishing *Mantikas* in this respect), and therefore was not misleading as a matter of law; thus, in contrast to *Mantikas*, these courts had no need even to consider whether a clarifying disclosure defeated the plaintiffs' deception claim. *See Wynn*, 2021 WL 168541, at *4 (concluding that the defendant's product "ma[de] no representations whatsoever about the source of the vanilla flavor or the ingredients constituting it," and distinguishing *Mantikas* on the basis that it involved "an express claim about ingredients"); *Twohig*, 2021 WL 518021, at *3, *5 (explaining that whereas the allegedly deceptive term under consideration "[was] merely a flavor

designator, not an ingredient claim," *Mantikas* involved "representations about an ingredient—whole grain—not a flavor"); *Pichardo*, 2020 WL 6323775, at *4 (explaining that the facts in *Mantikas* were "not analogous largely because vanilla"—the allegedly deceptive term at issue in *Pichardo*—"describes both a taste and an ingredient"); *Steele*, 472 F. Supp. 3d at 50 (distinguishing the plaintiff's claims from those in *Mantikas*, because the defendant's "container [did] not mention vanilla beans, or bean extract"); *Kennedy*, 2020 WL 4006197, at *11 (explaining that, in contrast to *Mantikas*, the allegedly deceptive term in question "[did] not implicate the same concern about a particular ingredient being highlighted and presented to consumers to deceive them into thinking such an ingredient [was] the primary or predominant ingredient"). Stated differently, the aspect of the *Mantikas* decision that addressed clarifying disclosures did not even come into play in these cases. *See, e.g.*, *Twohig*, 2021 WL 518021, at *6 ("[The] [p]laintiffs argue that the [i]ngredient [l]ist on the back of the [p]roduct is insufficient to correct or clarify the misleading statement on the front of the product. But, . . ., *the [p]roduct's front label is not misleading*." (emphasis added) (record citation omitted).) There is no basis to claim that *Mantikas*'s analysis regarding disclosures is limited to cases that make "explicit" ingredient claims, (*cf.* Def.'s Mem. 15); indeed, there is no basis to claim that this analysis is limited to deceptive labeling cases involving ingredient-related claims at all.

Second, as cases such as *Stoltz*, *Delgado*, *Goldemberg*, *Koenig*, *In re Frito-Lay*, and *Ackerman* suggest, courts were hesitant to dismiss deceptive labeling claims on the basis of small-print or easy-to-miss disclosures even before *Mantikas*. Although Defendant spends two paragraphs advancing a narrow interpretation of *Mantikas*, (*see id.* at 15–16), it ignores the considerable pre-*Mantikas* authority that also weighs against dismissing the instant claims. *Mantikas* only reinforced this line of authority. Thus, even if the Court accepted Defendant's

narrow reading of *Mantikas*, the outcome would not change here.  Indeed, the relevant principle
articulated in *Mantikas*—that reasonable consumers should not have to consult small-print or
otherwise obscure disclosures to correct a misleading impression created by prominent
representations on the front of a box—was drawn from a Ninth Circuit case (*Williams*) that
courts in the Second Circuit had previously invoked for the same proposition in response to a
range of factual scenarios.  *See Mantikas*, 910 F.3d at 637 (citing *Williams*, 552 F.3d at 939–40);
*see also Stoltz*, 2015 WL 5579872, at *17 (same); *Goldemberg*, 8 F. Supp. 3d at 479 (citing
*Ackerman*, 2010 WL 2925955, at *16, which in turn was citing *Williams*, 552 F.3d at 939–40); *In
re Frito-Lay*, 2013 WL 4647512, at *16 (citing *Williams*, 552 F.3d at 939–40); *Ackerman*, 2010
WL 2925955, at *16 (same).

Accordingly, at this stage in the case, the Court cannot hold as a matter of law that the
Products' disclosures eliminate the possibility that reasonable consumers might be misled by the
more prominent representations on the front of the packaging.

### iv.  Materiality

Finally, Defendant cites *Daniel*, discussed *supra*, for the proposition that GBL §§ 349–50
"require an additional finding that a reasonable consumer in like circumstances would consider
the representation *material*."  (Def.'s Mem. 18 (citing *Daniel*, 287 F. Supp. 3d at 189–90).)[6]
Defendant argues that "Plaintiffs have not plausibly alleged that the type of alcohol in Ritas is
material to the reasonable consumer in like circumstances," and that "Plaintiffs do not and could
not allege that they went to the store seeking a tequila or rum product or wine when they
purchased their Ritas."  (*Id.*)  Although *Daniel* suggested that courts must make some separate

---

[6] Accurately quoted, *Daniel* states that §§ 349–50 "require an additional finding that a
reasonable consumer in like circumstances would consider the *mis*representation *material*."  287
F. Supp. 3d at 189–90 (first emphasis added).

finding regarding materiality, *see* 287 F. Supp. 3d at 189–90, in discussing what constitutes

materiality, the court simply recycled the legal standard for establishing the second element of a

claim under GBL §§ 349–50: that is, a *material* misrepresentation is one that is "likely to mislead

a reasonable consumer acting reasonably *under the circumstances*," *id.* at 189 (quoting *Orlander*,

802 F.3d at 300); *see also id.* at 192 (explaining that to be *material*, an alleged misrepresentation,

"[v]iewed in *context*, . . . must be likely to mislead a reasonable consumer acting reasonably").

In other words, the materiality requirement is incorporated in the legal standard courts use when

evaluating whether plaintiffs have adequately pled the second element of a deceptive labeling

claim.  It does not form some quasi-distinct element that plaintiffs must separately satisfy.  For

reasons already discussed at length, Plaintiffs have "plausibly allege[d] that a significant portion

of the general consuming public or of targeted customers, acting reasonably in the circumstances,

could be misled" by the Products.  *Twohig*, 2021 WL 518021, at *3 (citation omitted).  Nothing

more is required.  In any event, the Court cannot say, as a matter of law, that the type of alcohol

in a beverage is *immaterial* to the reasonable consumer.  *Cf. Pichardo*, 2020 WL 6323775, at *6

(refusing to accept the plaintiffs' allegation "that consumers view the percentage of vanilla taste

that derives from vanilla extract to be a material fact that influences consumers' buying habits").

Indeed, that is an implicit premise of the Court's finding that Plaintiffs have adequately stated a

claim under GBL §§ 349–50.

     Accordingly, Plaintiffs have adequately pled the second element of their GBL claims.[7]

---

[7] The Court need not reach Defendant's arguments regarding Plaintiffs' allegations that
the Products violate federal regulations.  (*See* Def.'s Mem. 16–18; FAC ¶¶ 61–69.)  Plaintiffs
make clear that they "are not bringing a cause of action under the federal alcohol labeling
regulations and regulatory guidance."  (Pls.' Opp'n 10 n.7.)  In concluding that Plaintiffs have
adequately alleged a materially misleading representation, the Court has not relied on Plaintiffs'
assertions regarding Defendant's alleged violations of federal regulations.  (*See* FAC ¶¶ 61–69.)

c.  Injury

With respect to the third element of Plaintiffs' GBL claims, Defendant argues that Plaintiffs have not adequately pled injury because their "threadbare recitation of a price 'premium' theory lacks even minimal supporting detail."  (Def.'s Mem. 18.)  As stated, Plaintiffs allege that, had they known the Products were merely flavored malt beverages that did not contain tequila, wine, or rum, they would not have purchased the Products, or would have paid considerably less for them.  (FAC ¶¶ 12–13, 57.)  Defendant "submits that more should be required here," particularly because Plaintiffs "have injected alleged 'competitor brands' into the [First] Amended Complaint[,]" without disclosing pricing information for those comparator products.  (Def.'s Mem. 18–19.)

"An actual injury claim under [§§] 349 [and 350] typically requires a plaintiff to 'allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase.'"  *Duran*, 450 F. Supp. 3d at 350 (second alteration in original) (citation omitted).  A plaintiff can make this showing by alleging "an overpayment, or 'price premium,' whereby a plaintiff pays more than she would have but for the deceptive practice."  *Id.* (citation omitted).  To allege injury under this theory, a plaintiff "must allege not only that [the] defendants charged a price premium, but also that there is a 'connection between the misrepresentation and any harm from, or failure of, the product.'"  *Id.* (citation omitted). Typically, a plaintiff makes this allegation by asserting that a particular product was marketed as having a special quality, that the marketing enabled the company to charge a premium for the

---

To the extent the Court discussed these regulations *supra*, it was only to point out that Plaintiffs' misrepresentation claims are not inconsistent with these regulations.

product, and that the plaintiff paid this premium and later discovered that the product "did not, in fact, have the marketed quality."  *Id.* (gathering cases).

Here, Plaintiffs allege that they paid more for the Products "based on the beverage names 'Margarita,' 'Mojito,' 'Rosé,' and/or 'Sangria,' reasonably believing that the Products [would] contain tequila, rum, or wine."  (FAC ¶ 53.)  They also allege that if they had known the Products did not contain tequila, rum, or wine, they would have paid less for the Products or would not have purchased them at all.  (*Id.* ¶¶ 12–13, 57.)  At this stage of the case, these allegations suffice to allege a price premium theory of injury.  *See Fishon*, 2020 WL 6564755, at *10–11 (allegations that plaintiffs "would not have purchased the [product], or would not have purchased it on the same terms, [had] they kn[o]w[n] the truth," were sufficient to survive dismissal, because "[n]o more is necessary at this stage"); *Duran*, 450 F. Supp. 3d at 351 (plaintiff adequately pled a price premium theory of injury where he alleged that he and other customers "paid full price for the [p]roduct but received something inferior to what [the defendant] had promised, and that, had [he] known that the [p]roduct [was inferior], he would not have purchased the [p]roduct, or would have only paid significantly less for it"); *Kacocha*, 2016 WL 4367991, at *14 (allegation that plaintiff "would not have paid the premium price he paid" for the product had he "known the truth" was sufficient to state injury based on price premium theory (record citation omitted)); *Singleton*, 2016 WL 406295, at *10 (plaintiff stated claim under § 349 where he alleged that, had he "known 'the truth,'" he "would not have bought the vodka, or would have paid less for it" (footnote and some quotation marks omitted)).

The authority cited by Defendant is not to the contrary.  For example, Defendant cites *Wright v. Publishers Clearing House, Inc.*, 439 F. Supp. 3d 102, 116 (E.D.N.Y. 2020), for the proposition that "[p]laintiffs relying on a price premium theory . . . must still identify a plausible

basis for paying a price premium." (*See* Def.'s Mem. 19.)  But Plaintiffs have identified such a basis, namely the fact that the Products—according to Plaintiffs—purported to contain either tequila, rum, or wine. (*See* FAC ¶ 53.)  The other cases cited by Defendant, (*see* Def.'s Mem. 19), articulate the principle that "[s]imply . . . recit[ing] the word 'premium' multiple times in [a] [c]omplaint does not make [p]laintiffs' injury any more cognizable[,]" *Izquierdo*, 2016 WL 6459832, at *7; *Colella v. Atkins Nutritionals, Inc.*, 348 F. Supp. 3d 120, 143 (E.D.N.Y. 2018) (same); *see also Naimi v. Starbucks Corp.*, 798 F. App'x 67, 70 (9th Cir. 2019) (observing that "bare recitation of the word 'premium' does not adequately allege a cognizable injury").  As noted, however, Plaintiffs do not invoke the word "premium" without identifying a plausible basis for allegedly paying more than they otherwise would have.  Finally, although Defendant suggests "that more should be required here" because Plaintiffs have invoked the products of competing brands, it cites no authority that would authorize the Court to apply a more rigorous pleading standard in such a situation.  "Although plaintiffs sometimes point to comparators in support of a price premium claim, a plaintiff is not required to do so in order to allege injury." *Duran*, 450 F. Supp. 3d at 352 (citation omitted).  "And even when comparators are alleged, they do not have to be 'precisely comparable products,' and the 'actual comparability' of such products is a factual determination not appropriate for a motion to dismiss." *Id.* (alteration omitted) (quoting *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 69 (E.D.N.Y. 2017)).  That Plaintiffs have cited the labeling of competing products does not trigger a more exacting standard in order to allege injury.  Here, for the reasons already stated, Plaintiffs have adequately pled the injury prong of their GBL claims.

For the reasons stated above, Plaintiffs have adequately pled each element of their deceptive labeling claims under GBL §§ 349–50.  These claims survive the instant Motion.

2.  Breach of Express Warranty

Plaintiffs bring a claim for breach of express warranty in Count III of the FAC.  (FAC ¶¶ 98–107.)  "An express warranty is an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  *Barreto*, 2021 WL 76331, at *6 (citation and internal quotation marks omitted).  To adequately state a claim for breach of an express warranty under New York law, Plaintiffs must plead "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach."  *Wynn*, 2021 WL 168541, at *7 (quoting *Goldemberg*, 8 F. Supp. 3d at 482).  Under the New York Uniform Commercial Code, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."  *Singleton*, 2016 WL 406295, at *11 (alteration in original) (quoting N.Y. U.C.C. § 2–313(1)(a), (b)).  Moreover, "[a] buyer may bring a claim against a manufacturer from whom he did not purchase a product directly, since an express warranty 'may include specific representations made by a manufacturer in its sales brochures or advertisements regarding a product upon which a purchaser relies.'"  *Goldemberg*, 8 F. Supp. 3d at 482 (quoting *Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*, 858 N.Y.S.2d 405, 407 (App. Div. 2008)); *see also Randy Knitwear, Inc. v. Am. Cyanamid Co.*, 181 N.E.2d 399, 401, 404 (N.Y. 1962) ("dispens[ing] with the requirement of privity" for claims of "breach of express warranty by a remote purchaser against a manufacturer who induced the

purchase by representing the quality of the goods in public advertising and on labels which accompanied the goods").

Here, Plaintiffs allege that Defendant's description of the Products constituted a promise that the Products contained distilled liquor or wine; that this promise formed part of the basis of the bargain for purchasing the Products; that Defendant breached this promise "by failing to provide products with distilled liquors or wine"; and that Plaintiffs have suffered economic injury as a result.  (FAC ¶¶ 101–106.)  "Whether Plaintiff[s'] interpretation of the [Products'] label[s] was erroneous or reflected a promise made by Defendant necessarily depends on what a reasonable consumer would believe."  *Singleton*, 2016 WL 406295, at *11.  In the context of an express warranty claim—as with a claim under GBL §§ 349–50—this inquiry "is a matter of fact which is not appropriate for decision on a motion to dismiss."  *Ault v. J.M. Smucker Co.*, No. 13-CV-3409, 2014 WL 1998235, at *6 (S.D.N.Y. May 15, 2014) (observing that the plaintiff's claim for breach of express warranty—based on the defendant's labeling of its product as "All Natural"—turned on "what a reasonable consumer's interpretation [of that representation] might be," which "is a matter of fact . . . not appropriate for decision on a motion to dismiss").  For the same reasons Plaintiffs have plausibly alleged that the Products could mislead a reasonable consumer in violation of GBL §§ 349–50, Plaintiffs have plausibly alleged that Defendant breached an express warranty.  *See Buonasera*, 208 F. Supp. 3d at 567 (denying motion to dismiss express warranty claim because it "raise[d] a factual matter that [was] not appropriate to resolve on a motion to dismiss"); *Singleton*, 2016 WL 406295, at *11 (observing that the "[p]laintiff ha[d] plausibly alleged that [the] [d]efendant's vodka bottle labels could mislead a reasonable consumer, and therefore, [he] plausibly allege[d] breach of express warranties for the same reasons"); *Golbemberg*, 8 F. Supp. 3d at 483 ("[A]s the [c]ourt is unable to determine as a

matter of law that the statements are not misleading under GBL § 349, it is equally inappropriate

to determine they are not misleading for the [express] warranty claim").[8]

The Court dismisses Plaintiffs' express warranty claim on a separate ground, however.

"To assert a breach of warranty claim under New York law, 'the buyer must within a reasonable

time after he discovers or should have discovered any breach notify the seller of breach or be

barred from any remedy.'" *Tomasino v. Estee Lauder Cos.*, 44 F. Supp. 3d 251, 260 (E.D.N.Y.

2014) (brackets omitted) (quoting N.Y. U.C.C. § 2–607(3)(a)).  To satisfy this notice

requirement, a plaintiff must "alert [the] defendant that the transaction was troublesome," but

need not "include a claim for damages or threat of future litigation."  *Grossman v. Simply*

*Nourish Pet Food Co.*, —F. Supp. 3d—, 2021 WL 293774, at *11 (E.D.N.Y. Jan. 27, 2021)

(citation and brackets omitted).  Although "[t]he sufficiency and timeliness of the notice is

generally a question for the jury," *Tomasino*, 44 F. Supp. 3d at 260 (citation omitted), to

adequately plead the pre-suit notice requirement, "plaintiff[s] must provide factual allegations—

such as the date and method plaintiff[s] sent a pre-suit notice—supporting the contention that

[they] notified [the] defendant of the alleged breach within a reasonable time," *Grossman*, 2021

WL 293774, at *12.  Here, Plaintiffs allege in part that "[a]ll conditions precedent to Defendant's

liability under the above-referenced contract have been performed by Plaintiffs and members of

---

[8] Though Defendant does not raise the issue, "there appears to be a split within this [C]ircuit as to whether privity is required under New York law" in order to state an express warranty claim.  *Brady v. Anker Innovations Ltd.*, No. 18-CV-11396, 2020 WL 158760, at *10 (S.D.N.Y. Jan. 13, 2020).  Surveying this split in *Brady*, Judge Nelson S. Román persuasively explained why *Randy Knitwear*—which, as noted, dispensed with the privity requirement—"and its progeny remain good law even after the enactment of the U.C.C. in New York."  *Id.* at *11. Writing in early 2020, Judge Román observed that "[n]umerous courts in this [C]ircuit and in New York—as recently as last year—have followed th[e] holding [that privity is not a requirement of an express warranty claim]."  *Id.* at *10 (gathering cases).  However, because the Court dismisses Plaintiffs' express warranty claim on a separate ground, it need not take a position on this issue.

[the] New York Class."  (FAC ¶ 103.)  Courts have found that this general, boilerplate assertion does not establish compliance with the pre-suit notice requirement.  *See Tomasino*, 44 F. Supp. 3d at 261 (holding that allegation that "all conditions precedent to [the] [d]efendants' liability under this contract have been performed by [the] [p]laintiff and the other members of the [c]lass and NY [s]ubclass" was insufficient to establish that plaintiff had notified defendants of their breach of warranty (brackets and record citation omitted)); *In re Frito-Lay*, 2013 WL 4647512, at *27 (same with respect to plaintiffs' allegation that "[a]ll conditions precedent to [the] [d]efendants' liability under this contract have been performed by the [p]laintiffs and other members of the [c]lasses when they purchased the [p]roducts for their ordinary purposes" (record citations omitted)).  The FAC also contains the allegation that, "[w]ithin a reasonable amount of time after Plaintiffs discovered that Defendant did in fact breach the foregoing express warranties, Plaintiffs notified Defendant of the breach."  (FAC ¶ 107.)  Without more, this allegation is also insufficient to plead the pre-suit notice requirement.  *See Grossman*, 2021 WL 293774, at *12 (holding that the plaintiff's allegation—which stated that, "within a reasonable time after they knew or should have known of [the] [d]efendants' breach, [the] [p]laintiff, on behalf of herself and [c]lass [m]embers, placed [the] [d]efendants on notice of their breach, giving [the] [d]efendants an opportunity to cure their breach, which they refused to do"—was, "by itself, . . . insufficient to plead pre-suit notice" (record citation and brackets omitted)); *Mid Island LP v. Hess Corp.*, 983 N.Y.S.2d 204 (Table Decision), 2013 WL 6421281, at *4 (Sup. Ct. N.Y. Cnty. Dec. 2, 2013) (dismissing warranty claim where the complaint was "silent as to when the plaintiffs discovered the supposed breach, instead offering a legally conclusory statement that notice was given within a reasonable time thereof").

Because Plaintiffs do not allege specific facts in support of the allegation that they notified Defendant of the alleged breach within a reasonable time after its discovery, the Court will dismiss their express warranty claim without prejudice. *See Grossman*, 2021 WL 293774, at *12. Plaintiffs will be given leave to amend the FAC to correct this deficiency.

### 3. Fraud

Plaintiffs bring a claim for common law fraud in Count IV of the FAC. (FAC ¶¶ 108–15.) "Under New York law, stating a claim for fraud requires alleging (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Wynn*, 2021 WL 168541, at *7 (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). To adequately plead fraud, Plaintiffs must meet the particularity requirement in Rule 9(b) of the Federal Rules of Civil Procedure, which "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015) (citation omitted). Although Rule 9(b) "permits a plaintiff to allege scienter generally, . . . the Second Circuit has 'repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent.'" *Barreto*, 2021 WL 76331, at *8 (quoting *United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. 2017) (summary order)). Plaintiffs can establish this "strong inference" either "(a) by alleging facts to show that [the] defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Duran*, 450 F. Supp. 3d at 353 (quoting *Lerner v. Fleet Bank,*

*N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006)).  To determine whether a plaintiff has met the "strong

inference" requirement, courts should "consider the complaint in its entirety and take into

account plausible opposing inferences."  *Id.* (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells

Fargo Secs., LLC*, 797 F.3d 160, 177 (2d Cir. 2015)).  "If the inference is 'cogent and at least as

compelling as any opposing inference one could draw from the facts alleged,' then it is

sufficiently strong."  *Id.* (quoting *Loreley Fin.*, 797 F.3d at 177).

      Here, Plaintiffs have satisfied Rule 9(b)'s particularity requirements.  They have specified

the allegedly fraudulent statements—namely, Defendant's representations that the Products were

margaritas, mojitos, sangria, or rosé.  (FAC ¶ 110.)  They have identified Defendant as the

speaker.  (*Id.*)  They have alleged that the statements were made at the time they purchased the

Products in December 2019 (in the case of Plaintiff Cooper) and July 2020 (in the case of

Plaintiff Rose), (*id.* ¶¶ 12–13)—allegations that are sufficient, at this stage of the case, to satisfy

Rule 9(b)'s "where and when" requirement, *see Great W. Ins. Co. v. Graham*, No. 18-CV-6249,

2020 WL 3415026, at *24 (S.D.N.Y. June 22, 2020) (at motion-to-dismiss stage, plaintiff can

satisfy the "where and when" requirement by specifying a general time frame, and need not

allege "the specific date of every alleged misstatement" (citation omitted) (gathering cases)).

And Plaintiffs have alleged that Defendant's representation was fraudulent because the Products

did not contain wine or distilled liquors.  (*See* FAC ¶ 110.)

      However, the Court finds that Plaintiffs' allegations fall short of establishing a "strong

inference" of fraudulent intent.  The FAC does not "alleg[e] facts to show that [D]efendant[] had

both motive and opportunity to commit fraud."  *Lerner*, 459 F.3d at 290.  Although Plaintiffs

assert that "Defendant has intentionally used commonly known cocktail and wine names on its

packaging in order to induce Plaintiffs and other reasonable consumers to purchase and/or pay

more for the Products than they otherwise would have," (FAC ¶ 60), "simply alleging a defendant's self-interested desire to increase sales does not give rise to an inference of fraudulent intent," *Duran*, 450 F. Supp. 3d at 354 (allegation that defendant made a fraudulent representation "to boost sales" was insufficient to "raise a strong inference of fraudulent intent"); *see also Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (holding that generalized profit motive, "which could be imputed to any publicly-owned, for-profit endeavor," is insufficient to "support a strong inference of fraudulent intent"); *In re Frito-Lay*, 2013 WL 4647512, at *25 ("Frito-Lay's generalized motive to satisfy consumers' desires, [and] increase sales and profits, 'does not support a strong inference of fraudulent intent.'" (quoting *Chill*, 101 F.3d at 268)).

　　Nor does the FAC "alleg[e] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," *Lerner*, 459 F.3d at 291, though this, admittedly, is a closer call. Although Plaintiffs invoke an allegedly deceptive advertisement in which the speaker appears in front of a wine cellar, (*see* FAC ¶ 31; Pls.' Opp'n 21), the Court is not persuaded this advertisement constitutes the type of *strong* circumstantial evidence necessary to support an inference of fraudulent intent. The outcome might be different, for example, if Plaintiffs had plausibly alleged that Defendant was aware of consumers' preferences for beverages with distilled liquor or wine, and then deliberately marketed the Products as such in order to capitalize on that market. Such a scenario would be analogous to that in *Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453 (S.D.N.Y. 2020), in which the court found a viable allegation of fraud where the plaintiff alleged that the defendant was "aware of consumer beliefs about the healthful qualities of blueberries," and "sought to capitalize on those beliefs" by marketing one of its products as a "Blueberry Bagel," despite knowing that the bagel in fact contained only "trace amounts of real blueberries," *id.* at 457, 466 (record citation omitted). Though Plaintiffs invoke

*Panera Bread*, (Pls.' Opp'n 20), they have not put forth comparable allegations regarding "strong circumstantial evidence of conscious misbehavior or recklessness," *Lerner*, 459 F.3d at 291 (citation omitted).  Nor do Plaintiffs allege, for example, that Defendant was losing market share because of competition from canned cocktail manufacturers, and then decided to market its malt beverages deceptively as "cocktails" to salvage its position in the market for alcoholic beverages. *Cf. In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450, 2015 WL 7018369, at *35 (S.D.N.Y. Nov. 12, 2015) (holding that allegation that defendant "was lagging in the hybrid market and sought to improve its positioning by advertising improved fuel economy in its hybrid vehicles" was sufficient to adequately plead scienter).  In *Panera Bread* and *Ford Fusion*, the plaintiffs were able to identify a *specific* circumstance that gave rise to an inference of fraudulent intent, thus distinguishing those cases from *Duran* and *Frito-Lay*, where the plaintiffs could only point to a defendant's *generalized* profit motive to boost sales.  Finally, Plaintiffs' reliance on *Elkind v. Revlon Consumer Products Corp.*, No. 14-CV-2484, 2015 WL 2344134 (E.D.N.Y. May 14, 2015), (*see* Pls.' Opp'n 20), is unavailing.  There, the only cited basis for finding an inference of fraudulent intent was the allegation that the defendant knew its representation was false.  *See* 2015 WL 2344134, at *12 ("By pleading that [the] [d]efendant knew the phrase did not have the effects suggested, [the] [p]laintiffs have . . . pled sufficient facts to support an inference that [the] [d]efendant intended to defraud its customers." (record citation omitted)).  But "the simple knowledge that a statement is false is not sufficient to establish fraudulent intent."  *Campbell v. Whole Foods Market Grp., Inc.*, No. 20-CV-1291, 2021 WL 355405, at *12 (S.D.N.Y. Feb. 2, 2021) (brackets and citation omitted); *see also Colpitts v. Blue Diamond Growers*, —F. Supp. 3d—, 2021 WL 981455, at *13 (S.D.N.Y. Mar. 16, 2021) (same); *Davis v. Hain Celestial Grp.,*

*Inc.*, 297 F. Supp. 3d 327, 337 (E.D.N.Y. 2018) (same).  Thus, the Court finds *Elkind* unpersuasive.

As with Plaintiffs' express warranty claim, the Court dismisses the fraud claim without prejudice.  Plaintiffs will be given leave to amend the FAC to correct the deficiencies above.

### 4.  Unjust Enrichment

Finally, Plaintiffs bring a claim of unjust enrichment in Count V of the FAC.  (FAC ¶¶ 116–21.)  "The basic elements of an unjust enrichment claim in New York require proof that (1) [the] defendant was enriched, (2) at [the] plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what [the] plaintiff is seeking to recover."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Unjust enrichment "lies as a quasi-contract claim" that "contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'"  *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (citation omitted).  New York's highest court has made clear, however, that "unjust enrichment is not a catchall cause of action to be used when others fail."  *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  Rather, the claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  *Id.*  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Id.*

The Second Circuit has stated that "[t]wo claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages.'"  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (ellipsis omitted) (quoting *Sitar v. Sitar*, 854 N.Y.S.2d 536, 538 (App. Div. 2008)).  Here, the unjust enrichment claim is premised on the same

factual allegations as those supporting Plaintiffs' other claims, and Plaintiffs have not alleged

distinct damages with respect to this claim.  Accordingly, the Court must dismiss Plaintiffs'

unjust enrichment claim as duplicative.  *See, e.g.*, *Grossman*, 2021 WL 293774, at *13

(dismissing unjust enrichment claim that "duplicate[d] the plaintiff's other claims, which ar[o]se

out [of] identical facts," namely "the defendant's alleged misrepresentation on the [p]roduct

packaging"); *Wedra*, 2020 WL 1322887, at *11 (dismissing unjust enrichment claim that was

"duplicative of [the] plaintiff's other claims for material misrepresentations rooted in statutory,

contract, and tort law"); *Buonasera*, 208 F. Supp. 3d at 568 (dismissing unjust enrichment claim

that "rel[ied] on the same set of facts" underlying the plaintiff's claims for deceptive labeling and

breach of express warranty); *Mahoney v. Endo Health Solutions, Inc.*, No. 15-CV-9841, 2016

WL 3951185, at *11 (S.D.N.Y. July 20, 2016) (dismissing unjust enrichment claim that

"overlap[ped] with [the plaintiff's] fraud, fraudulent concealment, express warranty, and § 349

claims"); *Koenig*, 995 F. Supp. 2d at 290–91 (dismissing unjust enrichment claim as duplicative

of the plaintiffs' claims for deceptive labeling and breach of express warranty).

     The cases cited by Plaintiffs, (*see* Pls.' Opp'n 25), do not persuade the Court otherwise.

In *Nuss v. Sabad*, No. 10-CV-279, 2016 WL 4098606 (N.D.N.Y. July 28, 2016), which was

decided at the summary judgment stage, the court found that even if the plaintiff failed to

establish her tort claims at trial, a reasonable trier of fact could still find that the plaintiff was

entitled to "equitable recovery under a theory of unjust enrichment," and thus, her unjust

enrichment claim was not duplicative of other claims, *id.* at *11.  Thus, *Nuss* possibly presented

the "unusual situation[] whe[re], though the defendant ha[d] not breached a contract nor

committed a recognized tort, circumstances create[d] an equitable obligation running from the

defendant to the plaintiff."  *Corsello*, 967 N.E.2d at 1185.  In this sense, the *Nuss* court

explained, the facts before it were distinguishable from those in *Corsello*, where the New York

Court of Appeals found that the "plaintiffs' claims for either trespass or inverse condemnation

could not fail while still permitting an unjust enrichment claim." *Nuss*, 2016 WL 4098606, at

\*11; *see also Corsello*, 967 N.E.2d at 1185 ("To the extent that [the plaintiffs' trespass and

inverse condemnation] claims succeed, the unjust enrichment claim is duplicative; if [the]

plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects.  The

unjust enrichment claim should be dismissed.").[9]  This case, however, is more like *Corsello* than

*Nuss*.  That is, the Court "cannot conceive of any set of facts upon which [Plaintiffs] would fail

to establish [their] . . . statutory claims, but nonetheless succeed in proving unjust enrichment."

*Silva*, 2015 WL 5360022, at \*12; *see also Koenig*, 995 F. Supp. 2d at 291 ("Accepting the truth

of the allegations in the [c]omplaint, [the] [d]efendants reaped a financial reward at [the]

[p]laintiffs' expense.  However, to the extent that [the] [p]laintiffs' other claims succeed, 'the

unjust enrichment claim is duplicative,' and 'if [the] plaintiffs' other claims are defective, an

unjust enrichment claim cannot remedy the defects.'" (quoting *Corsello*, 967 N.E.2d at 1185)).

*Nuss* is therefore unavailing here.

     The two additional cases cited by Plaintiffs, (*see* Pls.' Opp'n 25)—*McCracken v. Verisma*

*Systems, Inc.*, No. 14-CV-6248, 2017 WL 2080279 (W.D.N.Y. May 15, 2017), and *Warner v.*

*StarKist Co.*, No. 18-CV-406, 2019 WL 1332573 (N.D.N.Y. Mar. 25, 2019)—hinge on a

misapplication of *Nuss* and the underlying authority on which *Nuss* relied.  The *McCracken* court

cited *Nuss* for the proposition that "[a]n unjust enrichment claim is not duplicative if a

'reasonable trier of fact could find unjust enrichment without establishing all the elements for

---

[9] To be clear, the Court takes no position on whether the conclusion in *Ness* was correct.
The purpose of this discussion is to explain why, assuming the court's analysis was correct, *Ness*
is distinguishable from the instant case.

one of [a plaintiff's] claims sounding in law."  2017 WL 2080279, at *8 (ellipsis omitted)

(quoting *Nuss*, 2016 WL 4098606, at *11).  This formulation is fine so far as it goes: if a plaintiff

can establish an unjust enrichment claim where his tort or contract claims fail, then, under

*Corsello*, the unjust enrichment claim is not duplicative of these other claims.  *See Corsello*, 967

N.E.2d at 1185.  The *McCracken* court's error was in how it applied this rule.  Whereas *Corsello*

envisions a fact-intensive inquiry, *see id.* (unjust enrichment "available only in *unusual*

*situations*," typically where "the defendant, though guilty of no wrongdoing, has received money

to which he or she is not entitled" (emphasis added)), the *McCracken* court reduced this analysis

to a formulaic, element-to-element comparison between two causes of action, *see* 2017 WL

2080279, at *8.  Specifically, the court compared the elements of unjust enrichment to the

elements of GBL § 349.  *See id.*  Because § 349 requires "proof that a defendant's acts are

directed to consumers," which is not an element of unjust enrichment, the court found that the

plaintiffs' unjust enrichment claim was not duplicative of their § 349 claim.  *Id.* (brackets and

citation omitted).  Citing *McCracken*, the *Warner* court simply replicated this error with respect

to GBL § 350.  *See* 2019 WL 1332573, at *3 (finding unjust enrichment claim not duplicative of

GBL § 350 claim because "[t]he elements for an unjust enrichment claim are distinct from the

elements for GBL claims under §§ 349 and 350").  Of course, this formulaic comparison of

elements produces anomalous results: so long as a claim contains an additional element that is

"distinct" from the elements of unjust enrichment, a plaintiff's claim for unjust enrichment will

automatically be deemed non-duplicative.  *See id.*  Such an approach is inconsistent with the vast

weight of case law, including *Grossman*, *Wedra*, *Buonasera*, *Mahoney*, and *Koenig*, all cited

above.  It is also inconsistent with the rule, articulated by the Second Circuit in *NetJets*, that

"[t]wo claims are duplicative of one another if they 'arise from the same facts and do not allege

distinct damages.'" *NetJets Aviation*, 537 F.3d at 175 (citation and ellipsis omitted).  Notably, this rule focuses on *facts* and *damages*, but says nothing about a comparison of elements.  Thus, *McCracken* and *Warner* cannot salvage Plaintiffs' unjust enrichment claim.

### III.  Conclusion

For the reasons stated above, Defendant's Motion is granted in part and denied in part. The Motion is denied as to Plaintiffs' claims under GBL §§ 349–50, but granted as to Plaintiffs' claims for breach of express warranty, fraud, and unjust enrichment.

Because this is the first adjudication of Plaintiffs' claims on the merits, dismissal of the express warranty, fraud, and unjust enrichment claims is without prejudice.  To the extent Plaintiffs have a good faith basis for filing a second amended complaint, they must do so within 30 days of the date of this Opinion & Order.  Failure to properly and timely amend will result in dismissal of these claims with prejudice.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 22).

SO ORDERED.

Dated:   August 9, 2021
         White Plains, New York

———————————————————————————
        KENNETH M. KARAS
        United States District Judge